Filed 10/15/14  In re H,K, CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re H.L., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E060516 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1200016) |
| v. | OPINION |
| Y.H., et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Tamara Wagner,

Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and

Appellant Y.H.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and

Appellant R.L.

1

Gregory P. Priamos, County Counsel, and Anna M. Marchand, Deputy County

Counsel, for Plaintiff and Respondent.

Defendants and appellants Y.H. (Mother) and R.L. (Father) appeal from an

order terminating their parental rights as to their 11-year-old daughter, H.L. (Welf. &

Inst. Code, § 366.26.)[1] On appeal, Father claims that the juvenile court erred in

denying his petition to modify the court order under section 388. Both parents also

contend the juvenile court erred in finding inapplicable the beneficial parental

relationship exception (§ 366.26, subd. (c)(1)(B)(i)) and the sibling relationship exception

(§ 366.26, subd. (c)(1)(B)(v)) to termination of parental rights. We reject these

contentions and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

This dependency proceeding has spanned over 11 years and involves two counties.

The family came to the attention of the Los Angeles County Department of Children and

Family Services (LA DCFS) in August 2003 when then 20-month-old D.L. (D.) and four-

month-old H.L. (H.) were removed from Mother's care due to Mother and Father's long-

standing history of abusing controlled substances, and a section 300 petition was filed on

behalf of the children.[2] At the time, Father's whereabouts were unknown. His

---

[1] All future statutory references are to the Welfare and Institutions Code unless
otherwise stated.

[2] D. is not a party to this appeal. D. had been a former dependent of the court,
and had recently been returned to Mother's custody before he was again removed from

*[footnote continued on next page]*

whereabouts continued to be unknown until several years later, even though he had actual knowledge of the proceedings.

On November 14, 2003, the juvenile court found the allegations in the petition true and declared the children dependents of the court. The children were formally removed from parental custody and placed in the home of their maternal grandmother. The parents were denied reunification services pursuant to section 361.5, subdivisions (b)(10) and (b)(13).

The maternal grandmother was interested in adopting the children but was unable to obtain a waiver from her estranged husband. D. had exhibited special behavioral needs that were addressed through the Regional Center. As of March 2004, the children had no contact with Mother or Father. Mother was in state prison and objected to adoption. She was scheduled to be released in March 2011, and asked that the children be placed in legal guardianship or long-term foster care.

At the November 17, 2004 section 366.26 hearing, the juvenile court granted the maternal grandmother legal guardianship of the children and the children remained dependents of the court. The court maintained jurisdiction for years, and there had been no personal contact between the children and their parents. Eventually, the children participated in some prison visits with their mother, and Mother had weekly telephone contact with the children.

---

*[footnote continued from previous page]*
her custody in August 2003. Mother also had an older son. She had failed to reunify with him and he was receiving permanent placement services in Los Angeles County.

3

D. had continued to experience behavioral problems. He was participating in counseling and being monitored by a psychologist.

Beginning in September 2008, LA DCFS began having concerns about the maternal grandmother. The children were not attending school and the maternal grandmother was evasive about where she and the children lived. In addition, D. began missing his counseling sessions, and H. had reported fighting within the home between relatives. Mother remained incarcerated and Father lived in Indiana. Father eventually engaged in limited telephone contact with the children.

On August 3, 2009, LA DCFS filed a section 387 petition on behalf of the children, and an amended section 387 petition on August 21, 2009, based on allegations that the maternal grandmother had failed to keep the agency advised as to the children's whereabouts, permitted unknown persons to live with the children, and had failed to maintain a drug-free residence. The children were removed from the maternal grandmother and placed in a foster home.

Father reported that he had an apartment; that he was drug-free, employed, and married; and that he wanted his children returned to him. Mother joined in the request to return the children to Father's custody or be placed with maternal aunt N.R., but also stated that she will be able to care for the children once she was released from prison. Father had numerous arrests and convictions for inflicting corporal injury/battery as well as felony convictions for grand theft and possession of narcotics.

4

Father appeared at an August 27, 2009 hearing with counsel, and requested custody of the children. LA DCFS requested the juvenile court order an Interstate Compact for Placement of Children (ICPC) proceeding. Father did not object to this request and specifically requested that an ICPC proceeding commence. The juvenile court therefore ordered LA DCFS to initiate an ICPC proceeding to facilitate possible placement of the children with Father in Indiana; and noted that there had been sustained allegations regarding Father during previous proceedings.

LA DCFS noted that, in the event Father had initially been provided with reunification services, it would have recommended that Father participate in individual and conjoint counseling, substance abuse counseling, a domestic violence program, a parenting education program, and random drug testing. Father's current employer reported that Father had tested for drugs at the time he was hired and there had been no cause to retest him. LA DCFS recommended that Father participate in further random drug testing, a parenting education program, and a domestic violence program.

On December 29, 2009, the juvenile court sustained the amended section 387 petition, and terminated the legal guardianship. The children's permanency plan was long-term foster care or return to Father. At that time, Father did not object at the hearing and did not request the children be placed in his custody.

On February 18, 2010, the juvenile court gave LA DCFS discretion to allow the children to visit Father in Indiana and ordered a new ICPC. The first ICPC had been denied, because Father had not enrolled in a domestic violence program or a parenting

class geared for children who have Attention Deficit Hyperactivity Disorder (ADHD). Both children were diagnosed with ADHD. LA DCFS required Father to prove he was participating in services prior to visitation.

The children were moved to a temporary foster home on May 19, 2010, and a permanent new foster home on June 23, 2010, due to sustained allegations of emotional abuse of the children by the prior foster parents. LA DCFS had attempted to place the children in the maternal aunt's home or the home of a maternal great-aunt, but was unable to place the children with relatives due to D. continuing to exhibit behavioral problems and the social worker not wanting to separate the siblings. The social worker believed separating H. and D. would be too traumatic on D.

In June 2010, Father began participating in a domestic violence program; and in September 2010, completed a parenting program with an ADHD component. Father, however, failed to regularly make telephone contact with the children, and eventually ceased calling the children altogether. He spoke to the children only when the social worker visited the children, and when the social worker made the call. The foster mother believed Father had no interest in the children. The children's Court-Appointed Special Advocate (CASA) recommended continuing the ICPC for father, but believed that Father should come to California to visit the children and to get to know them before sending them to live with Father. The CASA was concerned that Father had not made an effort to contact the children.

6

On December 1, 2010, the juvenile court conducted a hearing to address the ICPC. Father's counsel was present for the hearing. The juvenile court authorized unsupervised visits between Father and the children to take place in Los Angeles.

On March 14, 2011, the juvenile court was informed that the ICPC report was unfavorable towards placing the children in Indiana because Father's home was too small. The court ordered the ICPC be reinitiated and that the children's contact with their parents be improved.

Mother was thereafter able to place collect telephone calls to the children's foster home. The foster mother reported that the children were not excited to speak with Mother. D. continued to exhibit behavioral problems, resulting in being removed from his foster home in April 2011. D. had displayed violent and aggressive behavior, and had difficulty listening to adult directives, stealing, and fighting with others. He had also engaged in inappropriate sexual touching and behaviors. A former foster mother believed that D. had sexually molested his sister; it was later learned that the children had been exposed to pornographic material by Mother's older son. The foster mother was concerned about the safety of other children in her home as well as D.'s, and she did not feel she could control D. She believed that D. was in need of more help and was very upset at having D. leave her home because she had become very attached to him as well. H. understood why D. was removed from the home and reported that she was fine living separately from him.

H. did not remember Father and wanted to remain living in her foster home. The social worker believed that H. lacked a bond with Father. H. enjoyed her weekly visits with her extended family members and brother. H.'s foster mother and her maternal aunt L.H. were both interested in adopting H. The foster mother reported that H. considered the foster mother as her "mother" and referred to the other child in the home as her "sister"; that H. was not concerned about living separately from her brother; and that H. had expressed no interest in her parents. H.'s foster mother had a very close bond with both children and was facilitating and nurturing the sibling relationship.

On June 3, 2011, Father's counsel requested the juvenile court reinstate the ICPC in order to have his home assessed for placement of the children. As such, on July 12, 2011, another ICPC request was sent to Indiana. Father was in the process of moving to a new residence that could accommodate both children.

However, the CASA worker, H.'s foster mother, and maternal aunt L.H. expressed great concern in regards to placing the children in Father's care. Both children had expressed little interest in talking with Father and when the CASA worker offered to call Father, both children declined and ran off to play. The children desired to live with the maternal grandmother, and the CASA worker recommended the maternal grandmother be reassessed for placement as well. H.'s foster mother reported that Father had telephoned H. less than five times in the entire year H. had lived with her; and that H. had expressed anxiety and fear about possibly having to move out of state to live with Father. D.'s foster mother reported that Father's relationship with D. was strained and awkward and

8

that they had no relationship. Father acknowledged that he had limited contact with the children due to his work schedule and monetary resources available to visit the children, but had agreed to increase his telephone contact with the children to twice a week to get to know them. However, more than one communication with Father had been terminated in the month of June 2011 due to Father's inappropriate behavior and demeanor. Father was described as being " 'belligerent,' " " 'disrespectful,' " and appeared to be " 'Drunk.' "

On September 12, 2011, Mother was released from prison and filed a section 388 petition seeking reunification with the children. While incarcerated, she had completed a parenting program, anger management classes, religious studies, and substance abuse programs, and continued to participate in substance abuse and parenting classes at a center in Riverside. The children had participated in a visit with Mother on September 15, 2011. The visit went very well. Prior to the visit, Mother had expressed appropriate nervousness and excitement that any mother would feel after having not seen her children for three years. The children responded favorably to the visit and there was a strong bond between Mother and her children.

Mother had been paroled to Inglewood, but received permission to relocate to Riverside County. She lived in a four-bedroom home in Riverside with a fenced yard that was deemed appropriate by the LA DCFS social worker. Mother had unmonitored visits from October 27, 2011 through November 1, 2011, and November 4, 2011 through November 7, 2011, and had telephoned the children every evening to tell them goodnight.

9

On November 10, 2011, the children were returned to Mother's custody for an extended visit in her home in Riverside. The LA DCFS goal was to reunify the children with their mother.

On December 1, 2011, the juvenile court granted Mother's section 388 petition for a changed court order and transferred the matter to the Riverside County Juvenile Court.

On January 18, 2012, the Riverside County Juvenile Court accepted transfer of the proceedings.

However, less than three months later, Mother was arrested on drug-related charges, and sentenced to two years eight months in prison shortly thereafter. The children were taken into protective custody and initially placed together in a licensed foster home. On April 3, 2012, the Riverside County Department of Public Social Services (DPSS) filed a section 387 petition, and on June 29, 2012, the juvenile court sustained the petition.

Father reported that he would like the children placed with him in Indiana. Father claimed that he had been approved for placement; however, there was no documentation to confirm approval. An ICPC dated June 23, 2011, was pending; but DPSS initiated a new ICPC on May 8, 2012, through Riverside County.

On May 16, 2012, Father's counsel requested a status report on the ICPC. DPSS recommended the juvenile court approve an ICPC but opposed placing the children with Father. At the June 27 and 29, 2012 dispositional hearing, Father's counsel acknowledged that an ICPC had been denied and that he had failed to make a request for

10

custody.  Following the dispositional hearing, the court removed the children from Mother and terminated her services.  The court found a compelling reason not to set a section 366.26 hearing as there was no one willing to accept legal guardianship of the children, but found a permanent plan of living arrangement to be the most suitable for H.

The children desired to be placed with relatives, specifically their maternal aunt N.R. or their maternal grandmother.  The children were hesitant about going to live with Father, because they had not seen him in many years, did not know his family, and were unfamiliar with Indiana.  They also reported that they did not have a relationship with Father or his immediate family.  The social worker noted that the children showed a strong attachment to their mother while placed in her care; and they had expressed attachment to their maternal grandmother and to each other.  The social worker believed that it would not be in the children's best interest to place them with Father.  The social worker also noted that Father had been denied for placement through ICPC in 2009, 2010, and 2011; and that the LA DCFS social worker had concerns about placing the children in Father's care as he had overheard Father state to Mother that if he obtained custody of the children he would return them to the care of Mother or the maternal grandmother.

Initially, the children were placed together.  However, D. continued to exhibit aggressive and destructive behavior, resulting in numerous placements.  Meanwhile, H. made a positive adjustment to placement and appeared well-adjusted.  D. was placed with his maternal aunt N.R. on February 11, 2013, but engaged in behaviors that made it

11

impossible for the maternal aunt to continue to provide for him and to ensure his and her family's safety. As a result, D. was placed into group homes on April 3, 2012, and May 30, 2013. H. was eventually placed with her maternal great aunt and uncle, Mr. and Mrs. B., on May 9, 2013. H. had resided in Mr. and Mrs. B.'s home as a young child and they had a long and loving relationship. Mr. and Mrs. B. had cared for H. from the time she was five months old until she was five years old. H. was happy, comfortable, and well-adjusted in her relative caregivers' home; and her emotional, developmental, and educational needs were being met by her relative caregivers. Mr. and Mrs. B., as well as H., desired to move forward with a plan of adoption. DPSS therefore recommended the juvenile court set a section 366.26 selection and implementation hearing for H.

D. and H. participated in weekly sibling visits and visits with extended family members. The children enjoyed the sibling visits as well as the visits with extended family. H. engaged in telephone conversations with Father, but did not want to visit him or live with him. She wished to remain in the care and custody of Mr. and Mrs. B. H. also had monthly visits with Mother when Mother was transferred to a prison facility in Corona. H. reported that she liked seeing her mother but that she wanted to remain in the home of Mr. and Mrs. B. and be adopted by them, even if her mother is released from prison.

Mr. and Mrs. B. continued to seek adoption of H. and were committed to providing her with a permanent and loving home. They wanted to provide H. with security and stability and ensure H. continued to have frequent and consistent contact

with her brother, extended family members, and parents. H. wanted to be adopted by her relatives. She had understood the meaning of adoption and reported that she did not want to ever live with Mother again.

Father appeared at a hearing on November 14, 2013. H. refused to enter the courtroom because she did not want to see Father.

On January 7, 2014, Father filed a section 388 petition seeking to change the court order, and an amended section 388 petition on January 14, 2014. He stated that he had full-time employment, stable housing, paid $500 a month in child support, had maintained regular telephonic contact with H., and had completed parenting and domestic violence programs. He also stated that H. loved her father and shared a strong bond with him, and requested the juvenile court place H. in his custody on family maintenance services or family reunification services.

Mother filed a section 388 petition on January 15, 2014, requesting the court vacate the section 366.26 hearing, claiming that H. was not receiving visits as reported, despite the court's authorization; that the last time Mother saw H. was 19 months ago; and that H. was given "an odd definition of adoption by DPSS" and should be given accurate information before parental rights are terminated.

A hearing on the section 388 petitions was held on January 15 and 16, 2014. Both parents were present. Following testimony and presentation of evidence and

13

argument from the parties,[3] the juvenile court denied both parents' section 388 petitions, finding, in part, that it was not in H.'s best interest.[4]  The juvenile court thereafter found H. to be adoptable, that none of the exceptions to termination of parental rights applied, and terminated parental rights as to both Mother and Father.  This appeal followed.

II

DISCUSSION

A.     *Denial of Section 388 Petition*

Father argues that the juvenile court erred in denying his section 388 petition, requesting H. be placed in his care.  Specifically, Father argues that since he was a nonoffending parent when the section 387 petition was filed and the juvenile court did not need an ICPC to place H. in his care in the absence of a detriment finding, the juvenile court should have granted his section 388 petition and placed H. in his care.

DPSS responds that Father forfeited any claim that H. should have been placed in his care pursuant to section 361.2 and that section 361.2 was inapplicable because Father was an offending parent.  In the alternative, DPSS argues that any error was harmless.

---

[3] Mrs. B. testified that she had obtained approval from the prison to visit in late November, early December 2013; and that she had never taken H. to visit Mother in prison but had planned on taking H. after the holidays.

[4] As of January 16, 2014, the fourth ICPC had not been approved for Father, having been denied three previous times by Indiana ICPC.

1.    Section 361.2

Section 361.2 provides, in part, that when a court orders removal of a child pursuant to section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time of the events or conditions that brought the child within the provisions of section 300, who desires to assume custody of the child.  (§ 361.2, subd. (a).)  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.  (§ 361.2, subd. (a); *In re John M.* (2013) 217 Cal.App.4th 410, 420, citing *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829.)

A "nonoffending" parent is a parent who was not involved in the conduct that caused the removal of the child under section 361.  (*In re Marquis D.*, *supra*, 38 Cal.App.4th at p. 1823.)  A parent with whom the child was not residing at the time of the initiation of the dependency, whether or not due to a family law custody order, is presumptively entitled to custody because he or she has not been previously found to pose a risk of harm to the child.  (*In re A.A.* (2012) 203 Cal.App.4th 597, 610 [Fourth Dist., Div. Two] (*In re A.A.*).)  Only a presumed father is entitled to assume immediate custody under section 361.2.  (*In re Zacharia D.* (1993) 6 Cal.4th 435, 454.)

However, when a noncustodial parent fails to request custody or placement, section 361.2, subdivision (a), is not applicable.  (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 605.)  Furthermore, "[f]ailure to object to noncompliance with section 361.2 in the

15

lower court results in forfeiture." (*Ibid*.) In *In re A.A.*, as in the instant case, the mother did not challenge the jurisdictional allegations against her and did not request custody of her child, A.A., at the time of the disposition. This court held that the juvenile court "did not commit any technical violation of section 361.2. By failing to request custody, mother forfeited the right to be considered for placement as a noncustodial parent." (*Id*. at p. 606.)

Here, Father was not present at the section 387 dispositional hearing and did not request custody of H. at that time. He, however, informed the social worker that he desired custody of the children and that he would like to be approved for placement of the children as soon as possible. Nonetheless, Father forfeited the claim that the juvenile court did not make a detriment finding under section 361.2 after removing the children from Mother's custody in 2012. Father did not object to the court's best interest finding at the time of the dispositional hearing or anytime thereafter. Moreover, Father's section 388 petition did not mention section 361.2 or that Father sought a finding H. would not be subject to detriment if placed in his custody. Instead, Father alleged that he was "not a part[y] of the 387 petition and was not afforded services" and requested the juvenile court make an ICPC evaluation of his home in Indiana. Further, at the section 388 hearing, Father's counsel specifically argued the court should grant his section 388 petition because there had been a change in circumstances and a changed court order was in H.'s best interest. At no time did Father's counsel mention

16

section 361.2. Father therefore forfeited the right to be considered for placement as a noncustodial parent. (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 606.)

Even if Father had not forfeited his right to be considered for placement as a noncustodial parent, the juvenile court did not err in ordering that H. remain with her current caretakers, because there was substantial evidence that placing H. with Father would be detrimental to H.'s safety, protection, or physical or emotional well-being. (§ 361.2, subd. (a).) (*In re A.A.*, *supra*, 203 Cal.App.4th at pp. 604-605.) "We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [ ] the children would suffer such detriment [under section 361.2, subdivision (a)]. [Citations.]" (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426; see *In re Marquis D., supra,* 38 Cal.App.4th 1813, 1827.)

Here, substantial evidence of detriment to H. in placing her with Father included evidence taken from Father's testimony on January 15, 2014, that H. had lived with Father from the time of birth until she was only six months old.[5] Father had sporadically maintained a relationship with H. for the 10 years during these proceedings by speaking with H. by telephone occasionally. H. initially told the social worker that she was not sure she wanted to be placed with Father, later stating she wanted to remain with her caretakers. H. was not familiar with Father's home or current family in Indiana.

---

[5] Pursuant to the LA DCFS report dated September 2, 2003, H. and D. were removed and taken into protective custody at the ages of four months and 20 months, respectively.

Pursuant to Father's testimony, H. last saw Father when she was seven years old. At the November 14, 2013 hearing H. refused to enter the courtroom because she did not want see Father. H. did not want to visit Father in Indiana, and at the time of the section 388 petition hearing, H. was nearly 11 years old and wished to be adopted by her caretakers. The CASA social worker, H.'s former and current caretakers, and H.'s extended family expressed concern about placing H. with Father under such circumstances. Moreover, curiously, Father did not request placement or custody of H.'s brother whom H. regularly visited. H. enjoyed her visits with her sibling as well as her extended family in California. Further, a social worker from LA DCFS reported that Father had stated he would return the children to their mother or maternal grandmother once he gained custody, and another report indicated on one occasion Father was inappropriate during his telephone contact with the children. Evidence of these circumstances was sufficient to support a finding of detriment.

2.     ICPC

Father cites *In re Z.K.* (2011) 201 Cal.App.4th 51 for the proposition that an ICPC is not necessary when placing a child with a parent. An ICPC is a compact among California and other states to facilitate cooperation in the placement and monitoring of dependent children. (*In re John M.* (2006) 141 Cal.App.4th 1564, 1573; *In re Suhey G.* (2013) 221 Cal.App.4th 732, 742.) It "governs conditions for out-of-state 'placement in foster care or as a preliminary to a possible adoption,' " neither of which involve natural parents. (*In re John M.*, *supra*, 141 Cal.App.4th at p. 1573.) "Accordingly, 'compliance

with the ICPC is not required for placement with an out-of-state parent.' [Citations.]" (*In re Z.K.*, *supra*, 201 Cal.App.4th at p. 66; see *In re C.B.* (2010) 188 Cal.App.4th 1024, 1026, 1032 [Fourth. Dist., Div Two].) However, "nothing in the ICPC prevents the use of an ICPC evaluation as a means of gathering information before placing a child with such a parent." (*In re John M.*, *supra*, 141 Cal.App.4th at p. 1572; see also Cal. Rules of Court, rule 5.616(g) [the juvenile court has discretion to use the ICPC as necessary to ensure the child's safety and well-being in placing the child with an out-of-state parent].) When determining "whether the trial court erred in ordering an ICPC evaluation of father, we apply the abuse of discretion test [citation]." (*In re Suhey G.*, *supra*, 221 Cal.App.4th at p. 742.)

Father argues that his section 388 petition should have been granted because an approved ICPC was not required in January 2014 to place the child in his care. However, Father not only failed to object to DPSS's request for an ICPC, but he requested one himself. Indeed, up to and until the hearing on Father's section 388 petition, Father sought to have the juvenile court order an ICPC, never opposed the procedure, and requested an ICPC on January 14, 2014, in his section 388 petition. And, at the section 388 hearing, Father testified that he would comply with an ICPC proceeding.

A claim of error is forfeited on appeal if it is not raised in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute, § 366.26, subd. (c)(4), as stated in *In re M.R.* (2005) 132 Cal.App.4th 269, 273-274.) "The purpose of this rule is to

encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*Ibid.*)  A claim of error is also forfeited if the objection raised is not specific enough to give the lower court an opportunity to correct the error.  (*In re E.A.* (2012) 209 Cal.App.4th 787.)  "General objections are insufficient to preserve issues for review.  [Citation.]  The objection must state the ground or grounds upon which the objection is based.  [Citation.]." (*Id.* at p. 790.)  The rationale behind the forfeiture rule is that it would be "inappropriate to allow a party not to object to an error of which the party is or should be aware . . . . " (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 501.)  Dependency matters are not exempt from this rule.  (See, e.g., *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338-1339 [failure to request court to order bonding study]; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885-886 [failure to challenge setting of § 366.26 permanency planning hearing when court determined that no reasonable reunification efforts were made].)  As such, Father has failed to preserve this issue for appellate review.

In any event, Father's reliance on *In re Z.K.*, *supra*, 201 Cal.App.4th 51, is unavailing.  This case is readily distinguishable.  In *In re Z.K.*, the father of Z.K., an infant, disappeared with Z.K.  (*Id.* at p. 55.)  After five years of persistently searching for Z.K., the mother found Z.K.  She discovered over the internet that his father had been arrested and Z.K. had been placed in foster care.  By the time the mother contacted the department of social services to request custody of Z.K., the juvenile dependency proceedings had progressed to the stage of the section 366.26 hearing.  The juvenile court terminated the mother's parental rights and ordered a permanent plan of adoption.  (*Ibid.*)

The court in Z.K. reversed the order terminating parental rights, holding that, "by terminating her parental rights without finding it would be detrimental to the minor to be placed in her custody, the juvenile court violated mother's constitutional right to due process of law, which is rooted in her fundamental interest in the care, companionship, and custody of her child." (*Id.* at pp. 55-56.)

Here, by contrast, there were sustained allegations against Father in 2003 and a removal ordered based on clear and convincing evidence. The Los Angeles juvenile court had established jurisdiction, in part, due to Father's substance abuse, and H. was removed from both parents. In *In re Z.K.*, *supra*, 201 Cal.App.4th 51, the father had lied about the mother's circumstances, stating the mother was institutionalized and had abandoned the child, and the juvenile court sustained a juvenile dependency petition but there were no allegations regarding the mother's conduct, unlike here, and the mother was denied services because her whereabouts were unknown. (*Id.* at pp. 56-57.) As such, Father here has not been deprived of his due process rights. Moreover, as previously discussed, there is substantial evidence H. would face a risk of detriment in Father's care.

### 3. Section 388

Even if we assume, for the sake of argument, the juvenile court improperly relied on Father's failure to obtain a favorable ICPC evaluation in denying his section 388 petition, Father cannot establish prejudice.

21

"Under section 388, a person with an interest in a dependent child may petition the court to change, modify, or set aside a previous court order.  The petitioning party has the burden of showing, by a preponderance of the evidence, that there is a change of circumstances or new evidence, and the proposed modification is in the child's best interest.  [Citations.]" (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.)

"The grant or denial of a section 388 petition is committed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is clearly established.  [Citation.]" (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)  ". . . 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Even assuming arguendo that Father showed changed circumstances, he did not establish that a change in H.'s placement would be in the child's best interest.  As previously discussed, H. was nearly 11 years old at the time of the section 388 hearing; according to Father's testimony, she had not lived with Father since she was six months old; and she did not want to live with Father and did not want to visit him in Indiana.  We therefore conclude returning H. to Father's custody was not in her best interest.  Additionally, there was substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that H. would suffer detriment if she was removed from her relative adoptive parents and sent to live with Father in Indiana away from her

22

brother, the maternal grandmother, and extended family in California.  (See *In re Isayah C.* (2004) 118 Cal.App.4th 684, 699-700; *In re Luke M., supra,* 107 Cal.App.4th at p. 1426.)

        B.      *The Beneficial Parental Relationship Exception*

Mother and Father assert the juvenile court erred when it determined the beneficial relationship exception, under section 366.26, subdivision (c)(1)(B)(i), did not apply to preclude termination of parental rights.  We disagree.

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  Permanent plans include adoption, guardianship, and long-term foster care.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 296 (hereafter *In re S.B. II*).)  "Adoption, where possible, is the permanent plan preferred by the Legislature."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Adoption involves terminating the legal or parental rights of the child's natural parents.  (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 574.)  In order to avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply.  (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)  The exceptions permit the court, "in *exceptional circumstances*, [citation] to choose an option other than the norm, which remains adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

23

The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances: [¶] The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "Benefit," for this purpose, means that "the well-being of the child [is promoted] to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

"To meet the burden of proof, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) Only in the "extraordinary case" can a parent establish the exception because the permanent plan hearing occurs after the court has repeatedly found the parent unable to meet the child's needs. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The exception requires proof of "a parental relationship," not merely a relationship that is "beneficial to some degree but does not meet the child's need for a parent." (*In re*

24

*Jasmine D.*, *supra*, 78 Cal.App.4th 1339, 1350.) The existence of a beneficial relationship is determined by the age of the child, the portion of the child's life spent in parental custody, the quality of interaction between parent and child, and the child's particular needs. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689 [beneficial relationship exists where children in the mother's care the majority of their lives].) "Although the statute does not specify the type of relationship necessary to derail termination of parental rights, case law has required more than 'frequent and loving contact.' " (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424.)

We apply the substantial evidence standard of review to factual issues, such as the existence of a beneficial parental relationship, and the abuse of discretion standard to the discretionary determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) The analysis under either standard of review is essentially the same under both standards. As one court explained: " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if [it] find[s] that . . . no judge could reasonably have made the order that he did.'. . ." ' [Citations.]" (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

Assuming Mother and Father had maintained regular visits and contact with H. within the confines of their respective circumstances, i.e., incarceration and living out of state without resources to visit, neither parent has shown that the existence of his or her relationship with H. is sufficient to outweigh her need for a stable and permanent home. Although there was evidence that H. understood that Mother was her mother, that Father was her father, and that she enjoyed visits with Mother, there is no denying the fact that after being a dependent child of the court for nearly 11 years, H. required stability and permanency. H. had been in the dependency system since 2003, when she was four months old. We can also assume for purposes of our analysis that Mother and H. had a beneficial parent-child relationship. The parents, however, cannot establish that H. "would be greatly harmed" by terminating their parental rights. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.)

There is nothing in any of the social workers' reports to suggest that H. would suffer great harm as a result of proceeding with adoption and terminating the parents' parental rights. Indeed, there is ample support for the contrary conclusion. The relative caretakers, as the prospective adoptive parents, could provide not only the stability and permanency for H. that comes with adoption, but also a loving, nurturing home. The record shows that H. and her prospective adoptive parents have a long, strong and loving relationship; that H. had easily adjusted to living with her prospective adoptive parents; and that H. desired to stay with her prospective adoptive parents and to be adopted by them. H. had resided in her prospective adoptive parents' home as a young child and

they had cared for H. from the time she was five months old until she was five years old. H. was happy and comfortable in her prospective adoptive parents' home; and her emotional, developmental, and educational needs were being met by her prospective adoptive parents. H. reported that she did not want to visit Father or live with him, and wished to remain in the care and custody of her prospective adoptive parents, even if her mother was released from prison. There is no evidence that H. would suffer any detriment as a result of terminating parental rights.

Mother and Father rely on *In re S.B. II*, *supra*, 164 Cal.App.4th 289. In *In re S.B. II*, a bonding study described the bond between the child and parent as " 'fairly strong' or 'moderate.' " (*In re S.B. II*, *supra*, at p. 295.) "During the study, S.B. sat in [the father's] lap, played games and colored. [The father] was responsive to her requests. In the middle of coloring, S.B. said to [the father], 'I love you,' and he responded in kind. S.B. whispered and joked with [the father] and then spontaneously said, 'I wish I lived with you and Mommy and Nana.' " (*Ibid*.) At the hearing, the author testified that "because the bond between [the father] and S.B. was fairly strong, there was a potential for harm to S.B. were she to lose the parent-child relationship." (*Id*. at p. 296.) The trial court found that the beneficial relationship exception did not apply and the Court of Appeal reversed. (*Id*. at p. 301.)

In explaining the reasons for reversing the trial court, the *In re S.B. II* court stated: "For the first year after she was removed from parental custody, S.B. continued to display a strong attachment to [the father]. She was unhappy when visits ended and tried to leave

27

with [the father] when the visits were over. [The father] was sensitive to S.B.'s needs. Social worker Brown noted, '[the father] consistently puts his daughter[']s needs and safety before his own.' S.B. responded to [the father's] attention. During one visit, S.B. 'sat on [the father's] lap . . . [and] proudly showed off the pink tennis shoes he had bought her.' The record clearly establishes S.B. initiated physical contact with [the father]. Dr. Kelin observed that S.B. 'ran into [the father's] arms, again getting her father to pick her up.' [The father] and S.B. shared an affectionate relationship. S.B. 'nestle[d] up to [the father's] neck' and 'whispered and joked with him.' The record also shows S.B. loved [the father] and wanted their relationship to continue. S.B. whispered to her father, 'I love you.' As [the father] started to leave, S.B. stated, 'I'll miss you,' and then she gave him another hug. S.B. spontaneously said, 'I wish I lived with you and Mommy and Nana.' " (*In re S.B. II*, *supra*, 164 Cal.App.4th at p. 298.) The court concluded: "The record shows S.B. loved her father, wanted their relationship to continue and derived some measure of benefit from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [the father]." (*Id*. at pp. 300-301.)

The present case is distinguishable from *In re S.B. II*. The child's clear desire to live with the parent in that case is not present here. Although H. enjoyed her visits with Mother and there is evidence in the record to suggest a bond between Mother and H., there is little evidence that H. shared the kind of affection for Mother or Father that the child expressed for her father in *In re S.B. II*. More importantly, in contrast to S.B.'s

28

expressed desire to live with her father, H. indicated to the social worker that she agreed with the plan for adoption and wanted to live with her prospective adoptive parents, even after Mother is released from prison. Because of the factual differences between this case and *In re S.B. II*, that case is not controlling here.

Father also relies on *In re S.B. II*, *supra*, 164 Cal.App.4th 289, to argue a parent relying on the beneficial parent-child relationship exception to adoption does not have "to prove the child has a 'primary attachment' to the parent, or to show the parent and the child have maintained day-to-day contact." (Id. at p. 299.) However, "*S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact." (*In re C.F.* (2011) 193 Cal.App.4th 549, 558-559.) "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Here, there is some evidence to show that H. generally enjoyed her visits and contacts with her parents and that Father desired custody of H. "But this is simply not

29

enough to outweigh the sense of security and belonging an adoptive home would provide." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.)

For the foregoing reasons, and based on our review of the entire record, we conclude that the juvenile court did not abuse its discretion in determining that the parental benefit exception to adoption did not apply in this case.

C.     *The Sibling Relationship Exception*

The parents also argue that parental rights should not have been terminated because it would be detrimental to H. to sever her ties with her brother, D.  Like the beneficial parental relationship exception, the sibling exception can bar the termination of parental rights, and the party seeking to establish its existence must carry the burden of producing evidence on the issue.  (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252-253.)

The sibling exception bars the termination of parental rights when, "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(v).)  "In enacting this exception, the legislature was concerned with preserving long-standing relationships between siblings which serve as anchors for

dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.)

"[E]ven if a sibling relationship exists that is so strong that its severance would cause the child detriment, the court then weighs the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952-953.) The focus of this exception is on the welfare of the child who is being considered for adoption, not that of the sibling. (*In re Celine R.* (2003) 31 Cal.4th 45, 49-50.) It is a "rare" case in which the court will find that this exception to adoption applies. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014; see *Celine R.*, *supra*, 31 Cal.4th at p. 53 [statute permits court, "in *exceptional circumstances*" to choose option other than the preferred one, adoption].)

The first aspect that a proponent of the sibling relationship exception must prove is the existence of a beneficial sibling relationship. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 951-952.) There is no question here that such a beneficial sibling relationship between H. and her brother D. existed. From August 2003 until April 2011, H. and her brother had lived together with the maternal grandmother and then several foster homes until D. was removed from the foster home due to his behavioral issues. However, the siblings were then reunited when they were returned to Mother's care in November 2011, and then again separated in April 2012. H. and her brother are one year apart. There are multiple indications in the social workers' reports over the years of the closeness of H. and her brother, including many references to visits that the siblings enjoyed and the

31

significance of the relationship.  Therefore, "the undisputed facts established the existence of a beneficial . . . sibling relationship." (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

The second component involves the balancing of the benefits of continuing the sibling relationship against the benefits afforded to the child by adoption.  (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 952-953.)  As stated, we review the court's determination from this balancing effort under an abuse of discretion standard.  (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)  We find no abuse of discretion here.

One aspect of the court's balancing effort is the extent to which the termination of parental rights would result in "substantial interference with a child's sibling relationship."  (§ 366.26, subd. (c)(1)(B)(v); see *In re L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 951-952.)  A reviewing court assessing whether adoption will substantially interfere with the sibling relationship may consider evidence that the prospective adoptive parent had indicated a willingness to allow sibling contact to continue after adoption.  (*In re Valerie A.*, *supra*, 152 Cal.App.4th at p. 1014; *In re Erik P.*, *supra*, 104 Cal.App.4th at p. 405.)  Here, the prospective adoptive mother and father were willing to permit sibling contact.  Further, although there is no indication in the record that they did or did not plan to enter into a formal postadoption agreement concerning visitation, the prospective adoptive parents had expressly stated an interest that H.'s relationship with her sibling continue and had taken an active role in facilitating sibling visitation.  The prospective adoptive parents, who are relatives of the maternal family, had also expressly stated they

would ensure H. maintained a relationship with her parents and extended family. For this reason, the possibility that adoption would substantially interfere with sibling relationships is unlikely. Therefore, the court did not abuse its discretion in holding inapplicable the statutory exception to adoption, based upon an implied finding that H.'s relationship with her sibling would not be substantially impacted by the termination of parental rights. (See *In re Daisy D.* (2006) 144 Cal.App.4th 287, 293 [claim that adoption would interfere with sibling relationship cannot be based upon speculation].)

Additionally, even assuming adoption would substantially interfere with H.'s relationship with her sibling, the court's conclusion that adoption—the norm designated by the Legislature (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53)—should be the choice in this instance, thereby rejecting the statutory exception under section 366.26, subdivision (c)(1)(B)(v), was proper. As the Supreme Court has stated, under section 366.26, Mother and Father have a "heavy burden" in opposing adoption. (*Celine R.*, at p. 61.) The court must balance the beneficial sibling relationship, which may "leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer. [Citation.]" (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 951.) And as explained by another court where the evidence clearly supported the court's conclusion that adoption was in the child's best interests and outweighed any detriment resulting from a possible disruption to the sibling relationship: "Waiting would not bring stability to [the child] and, to the contrary, could leave her within the dependency system in perpetuity. She is entitled to stability now, not

at some hypothetical point in the future.  [Citation.]" (*In re Megan S.*, *supra*, 104 Cal.App.4th at p. 254.)

Here, H. had lived in numerous relative and foster homes for the last 11 years. She was doing well in school, had easily adjusted to her prospective adoptive parents, and had expressed a favorable view toward adoption by her prospective adoptive parents. The prospective adoptive parents had a loving relationship with H. and were very committed to adopting her.  Under these circumstances, the benefits of H.'s being adopted by a specific family whom she has known since birth and had recently lived with for over a year and with whom she had become very comfortable were manifest.  As the court said in *In re L.Y.L.*, and applying it here, "Valuing [H.'s] continuing relationship with [her sibling] . . . would deprive her of the ability to belong to a family, which is not in her best interests." (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 953.)

Mother contends that this case is similar to *In re Naomi P.* (2005) 132 Cal.App.4th 808, where the sibling exception was applied.  In that case, the child in question had three older, teenaged siblings who lived with their maternal grandmother.  The child was placed in foster care at birth when her mother admitted to using drugs during pregnancy. (*Id*. at pp. 811-813.)  The siblings and maternal grandmother visited her often.  (*Ibid*.) The foster parent was willing to adopt the child, but the maternal grandmother felt she could not take her on because of problems with one of the other siblings.  (*Id*. at pp. 813-815.)  The social worker who did not ask the siblings or the child about their feelings, testified that it was in the child's best interests to be adopted.  (*Id*. at p. 816.)  The

34

juvenile court ordered legal guardianship by the foster mother with regular visits to continue. The Department appealed. The Court of Appeal held that "[w]hen considering the sibling relationship exception, the concern is the best interests of the child being considered for adoption, not the interests of the child's siblings." (*Id*. at p. 822, citing *In re Celine R.*, *supra*, 31 Cal.4th at pp. 49-50.) The court found that the juvenile court relied on the testimony of the children and the foster mother, that the siblings had strong bonds and common experiences, and questioned the foster mother's appreciation of the importance of the sibling relationship. The court held that the juvenile court properly determined that guardianship was necessary in order to ensure continuation of the sibling relationship. (*In re Naomi P.*, *supra*, 132 Cal.App.4th at p. 824.)

A different conclusion is not required by *In re Naomi P.*, *supra*, 132 Cal.App.4th 808, because that case is distinguishable from the present case. There, "the appellant was a social services agency, and the issue was whether substantial evidence supported the juvenile court's finding that the sibling relationship exception to adoption was applicable. The appellate court affirmed the ruling, explaining, 'It is not our role to interfere with the trial court's assessment of the witnesses' demeanor and credibility.' [Citation.] The issue here is whether substantial evidence supports the court's finding the exception is inapplicable, and we consider the evidence in the light most favorable to the court's ruling." (*In re D.M.* (2012) 205 Cal.App.4th 283, 293, italics omitted.) Furthermore, in this case, unlike *In re Naomi P.*, there was no suitable way for the siblings to live together due to D.'s ongoing, uncontrollable behavioral issues. Moreover, there was no evidence

35

that the prospective adoptive parents were hindering H.'s relationship with D. and had, in fact, promised to facilitate and continue their visits. Under these circumstances, any detriment to H. from the loss of a legal tie to her sibling D. was necessarily outweighed by the benefit of being freed for adoption into a loving home.

This is not a case involving "exceptional circumstances [citation] [in which the court is permitted] to choose an option other than the norm, which remains adoption." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) We find no abuse of discretion in the juvenile court's determination that the sibling relationship exception of section 366.26, subdivision (c)(1)(B)(v) did not apply.

## III

## DISPOSITION

The order terminating Mother and Father's parental rights over H. and placing her for adoption is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:

KING _____
J.

MILLER _____
J.

36